FEDERAL DEPOSIT INSURANCE CORPORATION, Plaintiff-Appellee and Cross-Appellant, v. MICHAEL J. O'MALLEY, Defendant-Appellant and Cross-Appellee.

First District (5th Division)   No. 1—90—1718

Opinion filed June 25, 1993.—Rehearing denied August 10, 1993.

McNULTY, J., specially concurring.
GORDON, P.J., concurring in part and dissenting in part.

David A. Novoselsky & Associates, of Chicago (David A. Novoselsky and Linda A. Bryceland, of counsel), for appellant.

DeHaan & Richter, P.C., of Chicago (Marc J. Chalfen, of counsel), for appellee.

JUSTICE COUSINS delivered the opinion of the court:
The defendant, Michael J. O'Malley (O'Malley), appeals from the final judgment of the circuit court entered against him and in favor of

the plaintiff, the Federal Deposit Insurance Corporation (FDIC). On April 29, 1983, the First National Bank of Oak Lawn (the Bank) was closed due to insolvency, and the FDIC, in its corporate capacity, obtained the assets of the Bank for the purpose of liquidation. Among the Bank's records, the FDIC found an original written guaranty signed by O'Malley which purported to guarantee the indebtedness of one Dennis G. Dine (Dine). On January 1, 1984, the FDIC, in its corporate capacity, brought suit against O'Malley to enforce the guaranty. O'Malley claimed that the guarantee never formed part of the Dine loan transaction. O'Malley also argued, *inter alia*, that the Bank released him from all obligations prior to the FDIC takeover. Following a bench trial, the circuit court held that O'Malley's defenses were barred by 12 U.S.C. §1823(e) (1988) and entered judgment in favor of the FDIC.

We affirm.

BACKGROUND

The First National Bank of Oak Lawn was declared insolvent and closed on April 29, 1983. The FDIC, in its corporate capacity, obtained the assets of the Bank for purposes of liquidation. Among the Bank's records, the FDIC found an original written guaranty signed by O'Malley which purported to guarantee the indebtedness of Dennis Dine.

O'Malley's guaranty provided that it was absolute and continuing, and that O'Malley unconditionally guaranteed all of Dine's obligations to the Bank, whether then existing or created in the future. Among other things, the guaranty authorized the Bank's extension or renewal of Dine's obligations, release of liability of any of the guarantors, and waivers of notice and demand. O'Malley's guaranty was limited to the amount of $225,000, plus interest on such amount and expenses.

The Bank's records also contained two outstanding and unpaid original Dine notes. Evidence indicated that Dine was indebted to the Bank in the amount of at least $225,000 since February 1975, when he borrowed money from the Bank to purchase real estate. Dine subsequently signed a renewal note in the principal amount of $279,456.49 and another note in the principal amount of $643,852.50, both of which were dated April 28, 1981, and due October 26, 1981. Dine did not repay any principal or interest due under his two notes.

On September 15, 1983, the FDIC sent a letter to O'Malley demanding payment under the guaranty, but O'Malley failed to pay any amounts to the FDIC. On January 1, 1984, the FDIC brought suit

against O'Malley to recover the amount due from O'Malley under the guaranty.

O'Malley denied that he ever guaranteed the 1981 Dine loans and denied that the guaranty he signed was ever used or required in connection with any Dine loan at the Bank. Alternatively, O'Malley raised two affirmative defenses. First, that in 1979, four years prior to the FDIC takeover, he had been released in writing by the Bank from any guaranty obligations. Second, O'Malley claims that the exchange of mutual releases between the Bank and O'Malley in 1979 served as notice in writing to the Bank that any claimed guaranties were cancelled as of October 1979.

With respect to O'Malley's contention that the guaranty was never used or required in connection with any of the Dine loans, O'Malley presented the following evidence at trial. O'Malley testified that in 1975 both he and Wayne J. Bekta (Bekta) were on the board of directors of the Bank. O'Malley and Bekta were also business partners in various real estate transactions and developments. In 1975, he and Bekta became interested in developing a piece of real estate in Country Club Hills, Illinois. Dine, an experienced real estate developer and a long-standing customer of the Bank, also participated in the transaction. The parties agreed that Dine would borrow money, purchase the property and take title to the property; when the property was developed or sold, all three parties would profit.

Bekta and O'Malley subsequently agreed, between themselves, that if Dine could not get the loan for the $225,000 purchase price on his own, they would supply their personal guaranty. Sometime prior to February 28, 1975, Bekta and O'Malley signed the guaranty form in Bekta's car while the two were making an inspection of their business properties. O'Malley left the guaranty with Bekta.

On February 28, 1975, Dine secured the loan for $225,000. Evidence presented at trial indicated that the guaranty was not used in connection with the loan because the property was appraised for loan purposes at $420,000, nearly twice the amount of the purchase price. O'Malley testified that he did not know how the guaranty document got into the Bank file. At the time of trial, Bekta was deceased.

John Geary testified that in 1975, he was president of the Bank and that Dine had been a customer of the Bank for some years prior and subsequent to 1975. Geary was the loan officer who personally handled and approved the $225,000 loan to Dine on February 28, 1975. The only collateral required for the Dine loan was the Country Club Hills property which had been appraised at $420,000. Geary testified that the Dine loan was not made on the basis of any guaranty

signed by Bekta or O'Malley. He testified that the first time he had ever seen the guaranty signed by O'Malley and Bekta was during his discovery deposition.

A number of documents pertaining to the Dine loan supported Geary's testimony. For example, the loan proposal prepared by Geary in 1975 contains no indication of any guaranty requirements. The collateral checklist likewise does not indicate that a guaranty was required for the Dine loan. Additional documents admitted at trial corroborated Geary's testimony as well.

Dine testified that in 1975 he was a real estate developer. In 1975, he agreed with Bekta and O'Malley to purchase the Country Club Hills property because he hoped to receive a commission upon resale. He borrowed the money, took title to the property in a land trust, and assigned the beneficial interest of the land trust to secure the $225,000 loan in 1975. Dine testified that at no time was anyone, other than himself, required to guaranty the loan. He testified that the first time he ever saw or heard of the guaranty document in this case was at his discovery deposition.

In April of 1981, the two 1981 Dine loans were sold to the La Salle National Bank, and the sale was approved by Geary. Mark Hoppe, vice-president of the commercial lending department at La Salle National Bank, testified that he was unable to locate any document among La Salle's records that would indicate that a guaranty formed a part of the collateral or other documentation for the Dine loans purchased by La Salle National Bank. The Bank later chose to repurchase the loans, though it was under no legal obligation to do so.

With respect to O'Malley's affirmative defense that he was released from any guaranty obligations prior to the FDIC takeover, the following evidence was presented at trial. O'Malley testified that in 1979, five years after the loan was made and four years before the FDIC takeover, O'Malley sold his stock in the Bank and resigned as a director. He had no further dealings with the Bank after that date.

John Geary corroborated O'Malley's testimony. Geary testified that in 1979, O'Malley sold his stock in the Bank and terminated his business relationships with the Bank. This was part of an arm's length transaction and both sides were represented by counsel. At that time Geary, as president of the Bank, gave O'Malley a written release from any and all obligations at the Bank including any guaranties. The release was witnessed by the vice-president of the Bank, Nancy Adams. In return, Geary demanded and received from O'Malley a written release, releasing the Bank from any claims by O'Malley. Geary was authorized to execute releases to the same extent that he

was authorized to approve loans. His lending authority at the time for secured loans was between $350,000 and $750,000. Geary testified that the release documents were placed in the Bank's records.

However, Greg Adamonis, an FDIC liquidator and one of plaintiff's witnesses, testified that he was unable to locate a copy of the Bank's release to O'Malley among the Bank's records. Adamonis also testified that there were 400 or 500 boxes of bank documents in the possession of the FDIC and that he had not inspected them all. Among the files Adamonis did not inspect were O'Malley's files, Bekta's files and the Bank's corporate files. The defendant sought leave to have an expert, Ernst & Whinney, conduct a document audit of the Bank's records to attempt to locate a copy of the release or other relevant information. Defendant also sought the disclosure of the names of the FDIC "closing team" who participated in the closing of the bank. The circuit court refused to grant O'Malley's request and denied O'Malley's motion. Therefore, O'Malley claims that he was not in a position to rebut the testimony of the FDIC witnesses that a copy of the "release" was not in the Bank's records at the time of closing.

The FDIC did not attack the underlying validity of the release given to O'Malley. Instead, the FDIC took the position that O'Malley was precluded from asserting the release against the FDIC because the release failed to meet the requirements of 12 U.S.C. §1823(e) (1988), which provides in relevant part:

> "No agreement which tends to diminish or defeat the right, title or interest of the [Federal Deposit Insurance] Corporation in any asset acquired by it under this section, either as security for a loan or by purchase, shall be valid against the Corporation unless such agreement (1) shall be in writing, (2) shall have been executed by the bank and the person or persons claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the bank, (3) shall have been approved by the board of directors of the bank or its loan committee which approval shall be reflected in the minutes of said board or committee, and (4) shall have been, continuously, from the time of its execution, an official record of the bank."

Following a bench trial, the circuit court reached the following conclusions of law and fact:

> "One that the Defendant did in fact execute the guarantee which is the subject of this cause on or about February 25th, 1975.

Second that after execution the Defendant left the subject guarantee with Mr. Betka [sic], a co-maker thereof and also a director of the then First National Bank of Oak Lawn.

Thirdly [sic], that the original of the subject guarantee was found in the collateral vaults in the First National Bank of Oak Lawn on the day after the FDIC took possession of that institution and was found in the file with the notes of Dennis Dine.

Fourthly [sic], the First National Bank of Oak Lawn funded a loan to Dennis Dine in the sum of $225,000 on February 28th, 1975.

Fifthly [sic], that at no time from February 28th, 1975 until this discharge in bankruptcy was Dennis Dine ever indebted to the First National Bank of Oak Lawn or the FDIC as its successor in interest in any sum less than $225,000, the maximum principal obligation on the guarantee which is the subject of this action.

Sixthly [sic], that the FDIC as receiver of the First National Bank of Oak Lawn transferred and assigned the guarantee to the FDIC in its corporate capacity.

Seventh, FDIC in its corporate capacity is the holder of the guarantee which is the subject of this action.

Eighth, that the Defendant has failed and refused to make any payments due pursuant to the terms of the subject guarantee for either principal or interest.

Ninth, that as of March 13th, 1989 Dennis Dine was indebted to the FDIC in its corporate capacity in principal sums in excess of $225,000 by reason of two notes executed April 28th, 1981.

Tenth, that as of March 13th, 1989, there was interest accrued on the obligation pursuant to the subject guarantee in the sum of $235,411.64, and interest continues to accrue thereon at the rate of $83.25 per day.

Eleventh, that any agreements between the Defendant and Wayne Betka [sic] that the subject guarantee would only be used by the First National Bank of Oak Lawn if same were necessary for that intitutuion [sic] to grant a lona [sic] to Dennis Dine is and was an unwritten agreement, invalid, unassertible as against the FDIC by reasons of the provisions of Section 1823-E, Title 12 of the United States Code.

Twelfth, that the release executed by the then First National Bank of Oak Lawn dated October 1, 1979, was not approved by its Board of Directors or Loan Committee, nor was

any approval thereof reflected in the minutes of the Board or Loan Committee, and as a consequence thereof the release is invalid and unassertible as against the FDIC by reason of the provisions of Section 1823-E of Title 12 of the U.S. Code.

Thirteen, the fact that the First National Bank of Oak Lawn did not in fact rely upon the subject guarantee in making of the loan of February 28th, 1975 to Dennis G. Dine is irrelevant for the purposes of application of Section 1823-E generally under the holding of FDIC versus TWT 626 Fed sup [sic] 149.

Fourteen, no evidence has been introduced of any written notification by the Defendants to the First National Bank of Oak Lawn discontinuing the subject guarantee as required by the terms thereof, and any oral notification of discontinuance given or accepted being at variance with the terms of the subject guarantee is also invalid and unassertible against the FDIC by reason of Section 1823-E.

Fifteen, that even if one were to argue that the issuance of the release was an exercise of a unilateral right to release by the First National Bank of Oak Lawn as provided on the face of the guarantee, the exercise of that right of the issuance of the release on October 1, 1979 is unassertible as against the FDIC pursuant to Section 1823-E by reason of the lack of any approval therefore [sic] by the Board of Directors or Loan Committee reflected in the minutes of the First National Bank of Oak Lawn."

On May 1, 1989, based upon the foregoing reasons, the trial court entered judgment in favor of the FDIC and against O'Malley for a total sum of $464,490.80, consisting of $225,000 in principal and $239,490.89 in accrued interest. The order provided that it was nonfinal until the issue of attorney fees was resolved.

On January 16, 1990, O'Malley filed a post-trial motion in which he asserted that he was entitled to a new trial because, *inter alia*, Judge Hoffman should have recused himself pursuant to Supreme Court Rule 63(C)(1)(c) (113 Ill. 2d R. 63(C)(1)(c)) based on his prior representation of the FDIC within the past seven years. O'Malley also contested the amount of interest awarded by the court on the guaranty.

On May 16, 1990, following a hearing, the trial court concluded that Supreme Court Rule 63(C)(1)(c) had not been violated and denied O'Malley's motion for a new trial. The trial court held that the FDIC in its corporate capacity was not the same "party" as the FDIC as receiver. Since the trial judge had only represented the FDIC as re-

ceiver within the past seven years and the party before the court was the FDIC in its corporate capacity, the trial judge concluded that no violation of Rule 63(C)(1)(c) occurred.

The trial court granted the portion of O'Malley's motion which sought a reduction in the amount of interest awarded on the guaranty, and reduced the previous award of interest from $239,490.89 to $81,666.14. This appeal followed.

OPINION

O'Malley presents the following arguments on appeal: (1) the trial court erred in finding that the guaranty was an "asset" of the Bank at the time of the FDIC takeover; (2) the trial court erred in finding that the release was not in substantial compliance with the provisions of section 1823(e); (3) the trial court erred in refusing to declare section 1823(e) unconstitutional; (4) the trial court erred in failing to find that O'Malley was discharged from the guaranty due to the continued extensions of credit to Dine and/or the sale of the Dine loans to La Salle Bank; (5) the trial court erred in failing to grant O'Malley a set-off based on funds received from the sale of collateral securing the Dine loan and funds received from the settlement with the estate of Bekta; (6) the trial court erred in failing to find that O'Malley was entitled to a partial release of liability on the guaranty due to the FDIC's release of the alleged co-guarantor, Bekta; (7) the trial court erred in finding that the FDIC was entitled to interest on the guaranty; and (8) the trial court erred in denying the defendant a new trial where the provisions of Supreme Court Rule 63(C)(1)(c) were not complied with.

In its cross-appeal, the FDIC asserts that the trial court erred in reducing its award of interest due to the FDIC under O'Malley's guaranty.

I

■ Initially, O'Malley contends that the trial court erred in finding that the guaranty was an "asset" of the Bank at the time the FDIC took over. O'Malley presents three separate arguments in support of his contention that the guaranty was not an asset.

First, O'Malley argues that the guaranty was not a valid asset of the Bank because the guaranty never formed part of the Dine loan transaction. O'Malley asserts that the FDIC had the burden of demonstrating that the guaranty was valid and the FDIC failed to meet its burden.

O'Malley's argument is contrary to the law. The only burden the FDIC can be said to bear on this issue is the burden of demonstrating that the guaranty was found among the active files of the Bank. (See *Federal Deposit Insurance Corp. v. Venture Contractors, Inc.* (7th Cir. 1987), 825 F.2d 143, 146-47.) The FDIC met this burden. Mr. Murphy, a member of the FDIC takeover team, testified that he found the guaranty in the Dine collateral file. O'Malley does not dispute that the Dine collateral file was an active file of the Bank.

O'Malley admits that he signed the guaranty. O'Malley also admits that he left the signed guaranty with Bekta, a member of the Bank's board of directors. On its face, the guaranty is unconditional and applies to all liabilities owed by Dine up to $225,000. O'Malley's attempt to establish that the guaranty was never used in connection with any of the Dine loans is based upon his claim that he and Bekta had an understanding that the guaranty would only be used in the event that it was needed to secure the initial Dine loan. Proof of this unwritten understanding is precluded by section 1823(e).

O'Malley's argument was specifically rejected in *Federal Deposit Insurance Corp. v. Powers* (N.D. Ill. 1983), 576 F. Supp. 1167, *aff'd* (7th Cir. 1984), 753 F.2d 1076. In *Powers*, the FDIC in its corporate capacity sought to enforce guaranty instruments. As in the instant case, the closed bank's files contained the guaranty instruments. One of the defendants, like O'Malley, contended that he never agreed to guaranty the subject obligations and pointed out that the FDIC was unable to produce any listing of his guaranty in the bank's collateral register. The court rejected the defendant's contention that the guaranty was invalid, holding that the asserted defense was barred by section 1823(e):

> "The court *** holds Powers' asserted defense to be barred by §1823(e). The FDIC sues Powers on a facially sufficient written guarantee, and he wishes to defend on the basis of informal, unwritten arrangements and understandings between him and Drovers officials. These arrangements and understandings may have been convenient for the parties thereto, but they were not reflected on Drover's records. Powers wishes ultimately to prove that no guarantee contract ever existed, but that does not change the fact that he is asserting the type of private agreement that is invalidated by §1823(e)." *Powers*, 576 F. Supp. at 1171.

The reasoning of *Powers* is equally applicable to the case at bar. Accordingly, the trial court correctly held that section 1823(e) pre-

cluded O'Malley from asserting that the guaranty was invalid because it was not used in connection with the Dine loans.

■ O'Malley next asserts that the guaranty was not an asset of the Bank because the guaranty was extinguished by a written release executed by the Bank four years prior to the FDIC takeover. The trial court held that O'Malley was barred from asserting the release as a defense because the release did not meet all of the requirements of section 1823(e). Specifically, the trial court found that the release was not reflected in the minutes of the Bank's board of directors. O'Malley attempts to avoid this result by asserting that section 1823(e) does not apply to assets which are extinguished prior to the FDIC takeover.

It is true that section 1823(e) does not apply to every inquiry concerning an asset. (*Federal Deposit Insurance Corp. v. Merchants National Bank* (11th Cir. 1984), 725 F.2d 634, 639, *cert. denied* (1984), 469 U.S. 829, 83 L. Ed. 2d 57, 105 S. Ct. 114.) For example, section 1823(e) does not bar the defense of fraud in factum. (See *Langley v. Federal Deposit Insurance Corp.* (1987), 484 U.S. 86, 98 L. Ed. 2d 340, 108 S. Ct. 396.) Section 1823(e) also does not bar the defense that the asset is invalid due to the breach of bilateral obligations contained on the face of the asset that the FDIC seeks to enforce. (See *Howell v. Continental Credit Corp.* (7th Cir. 1981), 655 F.2d 743.) However, O'Malley's release does not fit within any of the narrow exceptions previously recognized by the Federal courts.

Furthermore, each of the cases O'Malley relies on is readily distinguishable. In *Federal Deposit Insurance Corp. v. Nemecek* (D. Kan. 1986), 641 F. Supp. 740, the Decatur County National Bank brought suit against the defendants-debtors to recover on an overdue mortgage prior to the FDIC takeover. The parties reached a settlement agreement whereby the debtors promised to deliver to the bank quitclaim deeds for the mortgaged property, and the bank promised to forgo seeking foreclosure and a deficiency judgment against the defendants. The quit claim deeds were delivered to the bank's attorneys by the defendants prior to the date the bank was taken over by the FDIC. However, the deeds were not yet in the bank's possession, and a formal release of liability had not been signed by the bank prior to its closure.

The FDIC was appointed as receiver for the bank and was substituted as plaintiff in the bank's suit against the defendants. In response to the defendants' motion to enforce the settlement agreement, the FDIC asserted that under section 1823(e), the FDIC could

not be bound by an oral settlement agreement which tended to reduce its interest in assets acquired from the bank.

The court refused to apply section 1823(e) to bar enforcement of the settlement because "Section 1823(e) applies only to assets which the FDIC *has* acquired." (Emphasis in original.) (*Nemecek*, 641 F. Supp. at 743.) The court found that the bank and the defendants had reached an accord and satisfaction prior to the bank's closing. "Therefore, when the FDIC purchased the Bank's assets, it could not have purchased defendants' note, as it had been previously extinguished." *Nemecek*, 641 F. Supp. at 743.

Unlike the defendants in *Nemecek*, O'Malley did not demonstrate that an accord and satisfaction took place. Instead, O'Malley relies on a blanket release which purported to release him from all liabilities owed to the Bank. The release does not mention the Dine guaranty and Geary testified that he was not even aware of the Dine guaranty when he issued the release. Accordingly, we find that *Nemecek* is inapposite to the facts of this case.

The remaining cases cited by O'Malley also fail to support his contention. In *Commerce Federal Savings Bank v. Federal Deposit Insurance Corp.* (6th Cir. 1989), 872 F.2d 1240, the court refused to apply section 1823(e) where the bank records pertaining to the instrument which the FDIC sought to enforce clearly indicated that the instrument had been "paid in full." In contrast to *Commerce*, nowhere in the Bank's records is there any indication that O'Malley's guaranty was paid in full. In fact, O'Malley has never claimed that he paid the guaranty in full. He argues instead that his obligations were extinguished by a purported release which does not even refer to the guaranty on the Dine loan. Therefore, *Commerce* is also inapposite to the facts at bar.

O'Malley's reliance on *Federal Deposit Insurance Corp. v. Blue Rock Shopping Center, Inc.* (3d Cir. 1985), 766 F.2d 744, is similarly misplaced. The holding of *Blue Rock* has been limited by a subsequent case from the third circuit. See *Adams v. Madison Realty & Development, Inc.* (3d Cir. 1991), 937 F.2d 845.

Each of the cases relied upon by O'Malley to support his contention that his obligation under the guaranty was extinguished prior to the FDIC takeover is inapposite. In contrast to the cases relied upon, O'Malley did not present any evidence at trial which would indicate that his guaranty was extinguished through an accord and satisfaction or full payment prior to the FDIC takeover. O'Malley may not avoid the requirements of section 1823(e) by asserting that the guaranty was extinguished via an instrument which does not comply with sec-

tion 1823(e). The trial court properly rejected O'Malley's contention that the guaranty was extinguished prior to the FDIC takeover and, therefore, was not an "asset."

■ O'Malley next contends that the trial court erred in failing to recognize that section 1823(e) does not bar defenses which arise out of the same document which the FDIC seeks to enforce. O'Malley argues that because the guaranty states that the Bank may release him and that he may cancel his guaranty upon certain conditions his defenses arise from the guaranty instrument itself and, therefore, are not barred by section 1823(e). O'Malley's final attempt to evade the requirements of section 1823(e) is unavailing.

A narrow exception to the application of section 1823(e) has been recognized in cases where the instrument the FDIC seeks to enforce facially manifests bilateral obligations. (See *Howell v. Continental Credit Corp.* (7th Cir. 1981), 655 F.2d 743.) In *Howell*, the FDIC sought to recover sums due under a lease agreement obtained from a closed bank. The defendant argued that it was not obligated to make the lease payments because the bank never performed its obligations under the lease. The FDIC maintained that the defendants' defense was barred under section 1823(e). Relying on reasoning from *Riverside Park Realty Co. v. Federal Deposit Insurance Corp.* (M.D. Tenn. 1978), 465 F. Supp. 305, the court held that section 1823(e) was not applicable under to the facts of that case:

> " 'When the enforcement of a separate collateral or secret agreement would alter the terms of an asset acquired by the FDIC so that the FDIC's right, title, or interest in the asset would be defeated or diminished, §1823(e) comes into play. [Citations.] * * *
>
> When, however, the asset upon which the FDIC is attempting to recover is *the very same agreement* that the makers allege has been breached by the FDIC's assignors, §1823(e) does not apply. None of the policies that favor the invocation of this statute are present in such cases because the terms of the agreement that tend to diminish the rights of the FDIC appear in writing on the face of the agreement that the FDIC seeks to enforce.' " (Emphasis in original.) *Howell*, 655 F.2d at 747, quoting *Riverside*, 465 F. Supp. at 313.

Similarly, in *Riverside*, the court held that section 1823(e) did not bar the defendants from asserting a breach of the terms of a loan agreement which was incorporated by reference into the deed of trust that the FDIC sought to enforce. Both *Riverside* and *Howell* are distinguishable from the case at bar.

Unlike the instrument in *Howell*, O'Malley's guaranty does not facially manifest bilateral obligations which serve as the basis of his defense. Nor does O'Malley contend that any term of his guaranty was breached. The Bank did not agree in the guaranty instrument to release O'Malley. The language of the guaranty merely indicates that the Bank *may*, at its option, release a guarantor without notice. Such a release would constitute a separate agreement which must meet the requirements of section 1823(e).

■ O'Malley's contention that his cancellation defense arises from the guaranty itself and, therefore, should not have been barred under section 1823(e) is equally unpersuasive.

We note that the guaranty does provide that O'Malley may cancel his obligations under the guaranty if he provides "written notice to the Bank of [his] discontinuance of [the] guaranty." O'Malley contends that the mutual exchange of releases between O'Malley and the Bank constituted "written notice of discontinuance" as well as notice to the Bank that O'Malley was no longer a party to the guaranty subsequent to October 1, 1979. We disagree.

O'Malley's reliance on *Federal Deposit Insurance Corp. v. Panelfab Puerto Rico, Inc.* (1st Cir. 1984), 739 F.2d 26, is misplaced. In *Panelfab*, the court found that the defendants had in fact executed a valid cancellation of their guarantees which complied with the express terms of the guaranty. *(Panelfab,* 739 F.2d at 29.) The cancellation letter specifically referred to the guarantees at issue and the cancellation letter indicated that other guarantees had been substituted in place of the guarantees which were cancelled. In contrast, neither of the alleged releases which O'Malley relies on refers to the guaranty at issue. The documents are merely blanket releases. Neither release purports to provide notice of cancellation of the guaranty. In fact Geary, the president of the Bank, testified that he was not even aware of the guaranty when he issued the release. The trial court did not err in finding that these documents could not serve as "written notice of discontinuance" as required by the guaranty agreement.

Although O'Malley has presented many innovative arguments in support of his contention that his guaranty was not an "asset" of the Bank at the time of the FDIC takeover, we remain unconvinced. The trial court properly held that O'Malley's guaranty was an asset under section 1823(e) and that O'Malley's defenses were barred by section 1823(e).

## II

■ O'Malley next contends that the trial court erred in not finding that the alleged release was in substantial compliance with section 1823(e). O'Malley complains that the trial court took the position that "strict, literal, compliance with the provisions of section 1823(e) was required to remove the agreement from [the] statute's application." O'Malley's contention is devoid of merit; the trial court correctly applied the statute as written.

O'Malley has not cited any authority for the proposition that "substantial compliance" with section 1823(e) is sufficient to remove an agreement from the statute's requirements, and we are aware of none. Congress opted for certainty in enacting the requirements set forth in section 1823(e) (see *Langley*, 484 U.S. at 95, 98 L. Ed. 2d at 349, 108 S. Ct. at 403), and this court is not at liberty to substitute a "substantial compliance" standard for the plain language of the statute. Accordingly, we hold that the trial court did not err in concluding that O'Malley's purported release failed to meet the requirements of section 1823(e).

## III

O'Malley next contends that the trial court erred in refusing to declare section 1823(e) unconstitutional either because it is vague and overbroad or because it impairs the obligations of contracts. O'Malley's contention that section 1823(e) is unconstitutional is without merit.

■ Section 1823(e) is in essence the codification of the United States Supreme Court case of *D'Oench, Duhme & Co. v. Federal Deposit Insurance Corp.* (1942), 315 U.S. 447, 86 L. Ed. 956, 62 S. Ct. 676. In *D'Oench*, the Supreme Court recognized that Federal policy protects the FDIC and the public funds it insures against misrepresentations of the bank's assets. To promote this Federal policy, the Supreme Court concluded that as a matter of Federal common law, a borrower was estopped from asserting unrecorded agreements not reflected in the records of the bank against the FDIC. *D'Oench*, 315 U.S. at 459, 461-62, 86 L. Ed. at 963, 964, 62 S. Ct. at 680, 681.

In 1950, Congress codified the *D'Oench* doctrine in 12 U.S.C. §1823(e). No court in the nation has ruled that this statute is unconstitutional. The statute has been in effect for four decades and has been construed and enforced repeatedly by the Federal courts, including the United States Supreme Court. (See, *e.g., Langley*, 484 U.S. 86, 98 L. Ed. 2d 340, 108 S. Ct. 396.) The few courts which have con-

sidered a constitutional challenge to section 1823(e) quickly dismissed such contentions with little discussion. (See, *e.g., Chatham Ventures, Inc. v. Federal Deposit Insurance Corp.* (5th Cir. 1981), 651 F.2d 355, *cert. denied* (1982), 456 U.S. 972, 72 L. Ed. 2d 845, 102 S. Ct. 2234; *Beighly v. Federal Deposit Insurance Corp.* (N.D. Tex. 1987), 676 F. Supp. 130, *aff'd* (5th Cir. 1989), 868 F.2d 776.) We conclude that the trial court did not err in rejecting O'Malley's constitutional challenge to section 1823(e).

## IV

■ O'Malley next contends that the trial court erred in failing to find that O'Malley was discharged from the guaranty due to the continued extensions of credit to Dine and/or the sale of the Dine loans to La Salle bank. This contention is wholly lacking in merit.

The express provisions of the guaranty authorize the Bank to sell the loans and extend additional credit to Dine without impairing the validity of the guaranty. The relevant provisions of the guaranty are as follows:

> "This guaranty shall be a continuing, absolute and unconditional guaranty ***.
>
> The Bank may, from time to time, without notice to the undersigned *** (c) *extend or renew for any period* (whether or not longer than the original period), alter or exchange *any of the Liabilities* ***.
>
> The Bank may, without notice of any kind, *sell, assign and transfer all or any of the Liabilities*, and in such event each and every immediate and successive assignee, ·transferee, or holder of all or any Liabilities shall have the right to enforce this guaranty ***.
>
> No action of the Bank permitted hereunder shall in any way impair or affect this guaranty ***." (Emphasis added.)

In light of the express provisions of the guaranty, we find that the trial court did not err in concluding that O'Malley was not discharged from his obligations on the guaranty due to the continued extensions of credit to Dine and/or the sale of the Dine loans to La Salle bank.

## V

■ O'Malley next contends that the trial court erred in not allowing a setoff for the sale of the collateral securing Dine's loans. We disagree.

In O'Malley's guaranty, he agreed to unconditionally guarantee the liabilities of Dine up to the amount of $225,000 plus interest. As

the trial court found, the evidence indicated that at all relevant times, Dine was indebted under his two notes in amounts of at least $225,000 in principal. There was testimony that certain collateral for the Dine loans was taken by the FDIC and that a $118,879.38 credit was given against the amounts due under the Dine loans. The FDIC representative, Mr. Adamonis, testified that he believed the credit had been applied to accrued interest. O'Malley's guaranty provided:

> "Any amount received by the Bank from whatever source and applied by it toward the payment of the Liabilities shall be applied in such order of application as the Bank may from time to time elect."

In light of the language of O'Malley's guaranty and the evidence that the principal balance due on the two Dine notes was $943,309.19, even the application of the $118,879.38 credit against the principal due from Dine would still have left an amount far greater than $225,000 as principal due from Dine. On the other hand, as the trial court recognized, if the $118,879.38 credit was applied to accrued interest, there would also have remained far greater than $225,000 due the FDIC from Dine as principal. The trial court's findings were not against the manifest weight of the evidence. We hold that the trial court properly concluded that O'Malley was not entitled to a setoff due to the sale of the Dine collateral.

O'Malley also contends that the trial court erred in failing to grant a setoff for funds received from the estate of Wayne Bekta in settlement of the guaranty claim. We disagree.

We note initially that the guaranty does not provide for a setoff of any kind. Moreover, O'Malley has not cited a single authority for the proposition that a setoff may be allowed against assets in possession of the FDIC.

Even if we were to assume that a setoff could be allowed, the evidence presented at trial does not support the setoff claimed by O'Malley. O'Malley argues that a setoff should be computed by proration based upon the alleged settlement agreement's references to the apparent principal amounts of five Bekta notes and the guaranty, which aggregate $1,090,000. There was no evidence introduced by O'Malley concerning the total amounts actually due under the five Bekta notes referenced in the alleged agreement, or of principal, interest, and other sums due under those notes. We conclude that O'Malley's asserted setoff computation is speculative and unsupported by the record.

## VI

■ O'Malley next contends that the trial court erred in failing to find that he was entitled to a partial release of liability on the guaranty due to FDIC's release of the alleged co-guarantor, Bekta. We disagree.

The general rule is that the release of a co-guarantor releases the remaining guarantors of liability on the guaranty to the extent of the proportionate value of their respective lost rights of contribution against the released guarantor, *absent a contrary agreement between the guarantor and the guarantee.* (*In re Estate of Tiemann* (1986), 141 Ill. App. 3d 512, 515.) In this case, however, the trial court found that the language of the guaranty did create a contrary agreement. The guaranty contained the following provisions:

> "The Bank may, from time to time, without notice to the undersigned (or any of them), *** (d) release or compromise any liability of any of the undersigned hereunder, *** and (f) resort to the undersigned (or any of them) for payment of any Liabilities ***.

> No action of the Bank permitted hereunder shall in any way impair or affect this guaranty."

The trial court found that the plain language of the guaranty contemplated the release of a co-guarantor without impairment of the guaranty as to the remaining guarantor. We agree. Accordingly, we hold that the trial court properly concluded that O'Malley was not entitled to a partial release.

## VII

■ O'Malley next contends that the trial court erred in finding that the FDIC was entitled to interest on the guaranty. In its cross-appeal, the FDIC contends that the trial court erred in reducing the amount of interest awarded to the FDIC.

The guaranty instrument provides that the FDIC is entitled to recover $225,000 "plus interest on such amount" from O'Malley. The guaranty does not prescribe an interest rate. O'Malley argues that because no interest rate is stated and nothing in the guaranty document provides a method for computing interest, the trial court erred in awarding interest on the guaranty. Alternatively, O'Malley argues that if the FDIC was entitled to interest, it should only have been awarded at the statutory rate. The trial court rejected both arguments.

The trial court found that the only logical interpretation of the term "interest" was that it referred to the interest rate provided in

the underlying loan. The trial court found that any other interpretation would render the phrase meaningless because absent the word "interest" the FDIC would have been entitled to statutory interest anyway under section 2 of the Interest Act (Ill. Rev. Stat. 1983, ch. 17, par. 6402).

The FDIC contends that the trial court erred in limiting the amount of interest due on the guaranty to the period of time prior to April 29, 1983. The trial court held that the FDIC failed to sustain its burden of proving the amount due after April 29, 1983.

At trial, the court awarded the FDIC interest in the sum of $239,450.89 based upon the testimony of Mr. Adamonis. Mr. Adamonis testified that he calculated the interest by using a PC program which loaded the interest rate and the dates that the prime rate changed and automatically calculated the interest. However, Mr. Adamonis did not state the source of the prime rate. He testified that the Bank's prime rate was "most closely tied to Continental's prime and the banks historics [sic] showed that they changed on even dates with the Continental Bank prime rate." Upon reviewing the record for purposes of the post-trial motion, the trial court realized that it had assumed that Mr. Adamonis used the Continental rate, but Mr. Adamonis never testified that he in fact used the Continental rate.

The trial court found that Mr. Adamonis never testified as to what rate or rates he did in fact use or the source of those rates. The trial court concluded that, since it was the FDIC's burden to prove the amount of interest to which it was entitled, and the FDIC did not meet its burden, the court's previous award of interest based upon Mr. Adamonis' calculations was erroneous.

After reviewing the record further, the trial court concluded that there was an alternative ground to support an award of interest to the FDIC, albeit a lesser award. The trial court observed that the April 28, 1983, trial balance of the Bank indicated that as of that date, the accrued interest on the Dine notes was $342,415.70. The trial balance was properly admitted into evidence as a business record of the bank.

The trial court calculated the total interest owed by O'Malley by multiplying the percentage of the Dine principle guaranteed by O'Malley times the total interest due. O'Malley guaranteed $225,000. The trial court concluded that the guaranteed sum of $225,000 was 23.85% of the total principle amount, $923,308.99. The court then multiplied 23.85% times the total interest accrued, $342,415.70, to arrive at the amount of interest owed by O'Malley, $81,666.14. The court found that the FDIC was not entitled to any interest in excess

of $81,666.14 because it failed to prove it was entitled to additional interest.

After a careful review of the record, we find no error in *the procedure* followed by the trial court to determine the amount of interest that the FDIC was entitled to receive. However, it appears that the trial court's computations were in error. According to the trial court computations, FDIC was entitled to $81,666.14. Our review of the computations based upon the principal and interest sums reflected in the record indicates that $225,000 should be *24.37%* (not 23.85%) of the total principal amount, $923,308.99, and that the correct computation of interest owed to the FDIC amounts to *$83,446.71*. Therefore, we must remand this portion of the decision for correction.

## VIII

■■ Finally, O'Malley contends that he is entitled to a new trial because a violation of Rule 63(C) occurred.

Supreme Court Rule 63(C) provides in relevant part:

"C. Disqualification.

(1) A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned, including but not limited to instances where

* * *

(c) he was, within the preceding three years, associated in the private practice of law with any law firm or lawyer currently representing any party in the controversy *** or, for a period of seven years following the last date on which he represented such a party, he represented any party to the controversy while he was an attorney engaged in the private practice of law." 113 Ill. 2d R. 63(C)(1)(c).

Supreme Court Rule 63(D) provides an alternative to disqualification where Rule 63(C)(1)(c) is implicated:

"D. Remittal of Disqualification.

A judge disqualified by the terms of Canon 3(C)(1)(c), *** may, instead of withdrawing from the proceeding, disclose on the record the basis of his disqualification. If, based on such disclosure, the parties and lawyers, independently of the judge's participation, all agree in writing that the judge's relationship or interest is immaterial, the judge is no longer disqualified and may participate in the proceeding. The agreement, signed by all parties and lawyers, shall be incorporated in the record of the proceeding." 113 Ill. 2d R. 63(D).

On the first day of trial, Judge Hoffman disclosed his prior representation of the FDIC to counsel in open court and counsel for both parties waived any objection to the judge's participation:

"THE COURT: I will tell you now for the record what I told you before lunch, that is on the liquidation of the Gateway National Bank of Chicago, I had occasion to represent the interests of FDIC. I had nothing to do with the FDIC in this case with First National of Oak Lawn, nor do I know who the liquidator of that liquidation is. Unless a party wishes to exercise a change of venue at this particular juncture, I am ready to start the trial.

MR. FITZPATRICK: You didn't work as an employee of FDIC?

THE COURT: Independent counsel representing the FDIC on liquidation of Gateway National Bank of Chicago, never an employee.

MR. FITZPATRICK: We have no objection.

MR. MALONEY: There is no objection at this time."

The dates of the trial judge's representation of the FDIC were not disclosed at this time. O'Malley was not in court at the time of the disclosure and defense counsel never discussed the waiver of any conflict of interest with O'Malley.

Sometime after the conclusion of the trial, the third district of this court handed down the decision of *Woods v. Durkin* (1989), 183 Ill. App. 3d 870. In *Woods*, the court held that where Rule 63(C) is implicated, an oral waiver by the attorneys will not relieve the judge from his duty to disqualify himself. Only strict compliance with the provisions of Rule 63(D) will relieve the judge of the duty to disqualify himself. Based upon the holding in *Woods*, O'Malley filed a post-trial motion alleging that despite the good faith of the court and counsel, Rule 63(C) had been violated and a new trial was required.

At a hearing regarding the post-trial motion on January 24, 1990, the trial judge made the following additional disclosures:

"THE COURT: The parties should know the following: Federal Deposit Insurance Company issued a resolution under sealed court records on July 14, 1979, Document No. 29597, designating the FDIC as a secret liquidator of the Gateway and National Bank of Chicago. That document was recorded in the Office of the Recorder of Deeds, Document No. 25064900. As a consequence of that liquidation, the law firm of which I was a partner represented the FDIC for a period of time.

It would appear in the representation of the FDIC that there were three cases that were still pending within seven years of the commencement of the case of FDIC versus O'Malley. The first would have been Gateway National Bank of Chicago versus Morris Halas, 78 CH 5525, which was dismissed by order of Judge Scotillo on August 11, 1982; the second being Gateway National Bank of Chicago versus Emmet Thomas, which was placed on the bankruptcy calendar by Judge Hechinger on November 29, 1982; the last being Gateway National Bank of Chicago versus Texas Harris, and that was a case that was dismissed by order of Judge Green on May 11, 1982. Each of these dates are [sic] within seven years of commencement of the trial of FDIC versus O'Malley.

\* \* \*

THE COURT: Yes, I personally represented the FDIC in all three of those cases.

[However], I can also indicate to you that there was no personal representation by me within the seven-year period, although I must indicate—and I am doing this from handwriting on the orders of the proceedings that are within these files—I should also indicate to you that I was a named partner of that firm and everything that had to do with that firm's representation of the FDIC at all times was under my direct supervision. There was no other partner of that law firm that was charged with the responsibility of supervising the FDIC case assigned to that firm at any time.

MR. CHALFEN: You did not personally appear in court?

THE COURT: Within the seven-year period, to the best of my knowledge, no, but I want to make it clear. Every lawyer who did appear in that court for that law firm within that seven-period [sic] would have done so under my direct supervision.

MR. CHALFEN: May I also clarify what your Honor indicated, I believe at the commencement of the trial that you never personally represented the FDIC in its corporate capacity?

THE COURT: No. I represented it only in its capacity as liquidator or receiver of the Gateway National Bank of Chicago

\* \* \* ."

In *Woods,* the court held that once Rule 63(C) comes into play, the judge must disqualify himself or both the parties and their attorneys must comply with Rule 63(D). Rule 63(D) requires all of the parties

and lawyers to agree in writing that the judge's relationship or interest is immaterial. It is undisputed that no written agreement between the parties and lawyers was executed in this case. Under *Woods*, the oral waiver by the attorneys was insufficient. Therefore, if Rule 63(C) were violated, O'Malley would be entitled to a new trial. For the reasons which follow, we conclude that no violation of Rule 63(C) occurred.

The circuit court held that Rule 63(C) was not violated because the circuit court judge previously represented the FDIC as receiver, and the party before the court at trial was the FDIC in its corporate capacity. The trial court concluded that the FDIC as receiver was not the same "party" as the FDIC as a corporate entity within the meaning of Rule 63(C)(1)(c).

We question the correctness of the trial court's conclusion that the FDIC as receiver is not the same "party" as the FDIC acting as a corporate entity. However, we need not address this issue because we conclude that there is another basis upon which to sustain the decision of the trial court. As a reviewing court we can uphold the trial court's decision on any ground which is supported by the record, regardless of whether the trial court relied on the ground and regardless of whether the trial court's reasoning was correct. *Bell v. Louisville & Nashville R.R. Co.* (1985), 106 Ill. 2d 135, 148; *Ahern v. Knecht* (1990), 202 Ill. App. 3d 709, 715.

Rule 63(C)(1)(c) requires a judge to disqualify himself "where *** for a period of seven years following the last date on which he *represented* such a party, he *represented* any party to the controversy while *** engaged in the private practice of law." (Emphasis added.) (113 Ill. 2d R. 63(C)(1)(c).) For the reasons which follow, we conclude that Judge Hoffman did not "represent" the FDIC in the manner contemplated by Rule 63(C)(1)(c).

With respect to the rules governing disqualification of judges, our supreme court has previously recognized a distinction between conduct which is merely supervisory and conduct which rises to the level of "acting as counsel." (*People v. Del Vecchio* (1989), 129 Ill. 2d 265, *cert. denied* (1990), 494 U.S. 1062, 108 L. Ed. 2d 779, 110 S. Ct. 1540.) In *Del Vecchio*, the supreme court construed the language of former Rule 67(c), which is the predecessor of Rule 63(C). Former Rule 67(c) provided:

> "A judge shall not participate in any case in which he has previously acted as counsel. He cannot rid himself of this responsibility by consent of counsel or the parties to the case." (73 Ill. 2d R. 67(c).)

In *Del Vecchio*, the defendant asserted that he was entitled to a new trial based upon the trial judge's involvement in a previous case in which the defendant was convicted of murder. The trial judge was an assistant State's Attorney and chief of the criminal division during the time the previous case involving the defendant was pending. The trial judge's involvement in the previous case consisted of assigning the case to another attorney and approving the defendant's request to expedite the indictment. Under these circumstances the supreme court concluded that the trial judge did not "act as counsel" in the previous case. *Del Vecchio*, 129 Ill. 2d at 278.

We acknowledge that in *Del Vecchio*, the supreme court was interpreting the language of former Rule 67(c), which differs from the language of current Rule 63(C). However, since Rule 63(C)(1)(c) incorporates former Rule 67(c), it is proper to look to decisions interpreting the former rule for guidance. (See *People v. Lopez* (1989), 187 Ill. App. 3d 999, 1008.) Furthermore, this court has previously found that the rationale of *Del Vecchio* is applicable to cases involving the present version of Rule 63(C). See *People v. Storms* (1992), 225 Ill. App. 3d 558, 566; *Lopez*, 187 Ill. App. 3d at 1008-09.

The key words in former Rule 67(c) were "previously acted as counsel." (73 Ill. 2d R. 67(c).) These words were applicable both to assistant State's Attorneys and to private attorneys. The court in *Del Vecchio* considered the nature of the involvement of the assistant State's Attorney and held that the assistant State's Attorney did not "act as counsel." *Del Vecchio*, 129 Ill. 2d at 278.

The key words in Rule 63(C)(1)(c) are "represented any party to the controversy." (113 Ill. 2d R. 63(C)(1)(c).) In this case, Judge Hoffman was the partner in charge of all cases involving the FDIC at his law firm. He stated that he would have directly supervised and reviewed work done by associates in connection with FDIC matters. On the other hand, Judge Hoffman also stated on the record that he had "no recollection of having personally appeared in court or handled these matters within the past seven years." His records indicated that the last of the FDIC cases were disposed of in 1982.

The rule enunciated in *Del Vecchio* is that "[m]erely having a previous involvement with a defendant does not, *per se*, require disqualification." (*Del Vecchio*, 129 Ill. 2d at 277.) Illinois courts have rejected the rule that recusal is mandatory "if the trial judge was in any way associated with the case." (*United States ex rel. Link v. Lane* (7th Cir. 1987), 811 F.2d 1166, 1171.) That rule is equally applicable in this case. Merely having the previous involvement as appears from the facts of this case does not, *per se*, require disqualification. Applying

the rationale of *Del Vecchio* and its progeny, we conclude that Judge Hoffman's supervision of these cases did not amount to "representation" within the meaning of Rule 63(C)(1)(c) and disqualification was not required. Therefore, no violation of Supreme Court Rule 63(C)(1)(c) occurred.

Assuming *arguendo* that a violation of Rule 63(C)(1)(c) did occur, reversal of the trial court's decision would not be warranted. In this case, neither counsel nor the trial judge was aware of any ground for recusal until the completion of the trial. It cannot be said that an appearance of impropriety was created under these circumstances. Furthermore, the trial judge indicated that he had no recollection of personally representing the FDIC within the seven-year period. Under the facts and circumstances of this case, a determination that any violation of Rule 63(C)(1)(c) mandates a *per se* reversal would serve neither the purposes of the rule nor the ends of justice.

In summary, we conclude that the trial court correctly held that O'Malley's defenses were barred by section 1823(e) and that the guaranty at issue was an "asset" for purposes of section 1823(e). The trial court correctly held that O'Malley was not discharged from his obligations under the guaranty due to the continued extensions of credit to Dine or the sale of the Dine loans to La Salle bank. The trial court correctly held that O'Malley was not entitled to any setoff or partial release from liability. The procedure used by the trial court to determine the amount of interest due on the guaranty instrument was not erroneous, but its computations were incorrect. Accordingly, the trial court is directed to review the interest computations and enter the correct amount upon remand. Finally, a new trial was not warranted because Supreme Court Rule 63(C)(1)(c) was not violated.

Affirmed in part; reversed in part and remanded with directions.

JUSTICE McNULTY, specially concurring:

I agree that a literal reading of Supreme Court Rule 63(C)(1)(c) supports the dissenting opinion's view in this case that disqualification of the trial judge was required absent a written remittitur by counsel and the parties.

It further concludes, however, that while the majority apparently construes the rule to permit a qualitative evaluation to be made as to whether disqualification is required, it can find no such discretionary latitude under the rule as currently drafted.

It is my opinion that the supreme court in *People v. Del Vecchio* (1989), 129 Ill. 2d 265, 544 N.E.2d 312, construing the language of

former Rule 67(c), the predecessor to Rule 63(C), provides the authority to permit a qualitative evaluation to be made of the facts and circumstances of each case in which the issue of disqualification is raised. Therefore, I conclude that under the facts and circumstances of this case, a determination that any violation of Rule 63(C)(1)(c) mandates a *per se* reversal would advance neither the purpose of the rule nor the ends of justice.

PRESIDING JUSTICE GORDON, concurring in part and dissenting in part:

While I agree with the analysis of the majority as to the merits of the claim of the FDIC against the defendant, I must disagree with respect to the analysis of the issues raised under Supreme Court Rule 63(C)(1)(c). (134 Ill. 2d R. 63(C)(1)(c).) Under the provisions of Supreme Court Rule 63(C)(1)(c), a judge must disqualify himself unless all agree otherwise in writing if, "for a period of seven years following the last date on which he represented such a party, he represented any party to the controversy while he was an attorney engaged in the private practice of law." (134 Ill. 2d R. 63(C)(1)(c).) This rule provides:

> "(1) A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned, including but not limited to instances where
>
> * * *
>
> (c) he was, within the preceding three years, associated in the private practice of law with any law firm or lawyer currently representing any party in the controversy (provided that referral of cases when no monetary interest was retained shall not be deemed an association within the meaning of this subsection) or, for a period of seven years following the last date on which he represented such a party, he represented any party to the controversy while he was an attorney engaged in the private practice of law." 134 Ill. 2d R. 63(C)(1)(c).

The majority has incorrectly attempted to apply the distinction made by the supreme court in *People v. Del Vecchio* (1989), 129 Ill. 2d 265, 544 N.E.2d 312, a criminal prosecution, to the facts of this case. In *Del Vecchio* the Illinois Supreme Court interpreted the former Supreme Court Rule 67(c) (73 Ill. 2d R. 67(c)) to require a judge who was a former State's Attorney to recuse himself only if he was the actual counsel in the prosecution and not if he was a mere supervisor or department head with only nominal involvement in the prosecution.

The court held that the phrase "acted as counsel" under the old rule excluded involvement consisting solely of personal supervision or mere approval of ministerial administrative procedures.

However, there is a very substantial difference between the nature of the representation provided with respect to attorneys in the private practice of law and those engaged in the public practice as employees of a governmental agency.

In the public sector, the relationship between counsel and client is different in nature since the attorney has no special financial or proprietary interest in the client, namely the government or the public agency by whom the attorney was employed. There the focal point of the attorney/client relationship consists of the specific dispute in which the lawyer is acting on the client's behalf. This aspect was emphasized under former Rule 67(c), the predecessor of the current rule, which prohibits the judge from participating in a case in which he had previously acted as counsel.

Former Rule 67(c) provided:

> "A judge shall not participate in any case in which he has previously acted as counsel. He cannot rid himself of this responsibility by consent of counsel or the parties to the case." (73 Ill. 2d R. 67(c).)

The prohibition under former Rule 67(c) is now covered under Rule 63(C)(1)(b). Rule 63(C)(1)(b) provides that judicial recusal is required if "he served as lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter, or the judge or such lawyer has been a material witness concerning it." (134 Ill. 2d R. 63(C)(1)(b).) Under Rule 63(C)(1)(b), no distinction is made between the private and public practice of law.

Subsection 63(C)(1)(c), however, applies specifically to the past relationship between the judge and his former clients even though the case or "controversy" is new. Under this provision, the judge's past relationship with the client should not depend on whether he or she represented that client in court but rather whether he or she was a member of the firm when that client was represented and whether he or she shared in that client's fees.

The distinction drawn by the majority pursuant to *People v. Del Vecchio* extends only to the provisions of former Rule 67(c) under which it was decided and under its present counterpart, Rule 63(C)(1)(b), which prohibits service of the judge where "he served as lawyer in the matter in controversy." 134 Ill. 2d R. 63(C)(1)(b).

In point of fact, the current Rule 63(C)(1)(c) specifically excludes from its provisions past representation by virtue of employment in governmental agency, by specifying, "while he was an attorney engaged in the private practice of law." 134 Ill. 2d R. 63(C)(1)(c); Ill. Ann. Stat., ch. 110A, par. 63(C), Committee Comments, at 30-33 (Smith-Hurd Supp. 1992).

Under Rule 63(C)(1)(c), which applies to the private sector only, no meaningful distinction can be drawn between the interest of the actual trial counsel and the billing or supervisory partner. If anything, the partner who approves of and bills out the work performed for a client or for that matter who shares in the revenues derived from a client is as likely to find himself with conflicting interests or loyalties as the attorney who performed the work in the legal trenches.

Moreover, the trial judge in this case did not disclaim participation in quarterbacking the strategies on behalf of the FDIC. He merely stated that he did not make any court appearances on its behalf but disclosed that he had full supervisory authority over the matters which his office handled on that client's behalf.

The parallel structure of Rule 63(C)(1)(c) supports this conclusion as well. The first portion of 63(C)(1)(c), which controls for three years, applies to any judge associated in the practice with any lawyer or law firm representing a client before such judge. Thus, for a three-year period, even if the client came to the firm after the judge terminated his association with it, the judge must still recuse himself based upon his association with it notwithstanding that such association predated the acquisition of that client. The second part, which provides for a seven-year restriction, should then apply, as I believe it does, to those situations where the client was being represented by the firm during the time the judge was associated with it, even though the judge did not then take an active role in that client's matters. Otherwise, the rule would not provide for such instances where the judge was associated with a firm while it represented the client where his role regarding that client was passive. Such instances would then have to be treated within the first provision of Rule 63(C)(1)(c), which does not require the judge to be associated with the firm contemporaneously with its representation of the client as long as he was associated with that firm within the designated three-year period.

While the majority apparently construes the rule to permit a qualitative evaluation to be made as to whether reversal is required, we can find no such discretionary latitude under the rule as currently drafted. Moreover, the language of Rule 63(D) which permits waiver only if "the parties and lawyers *** all agree in writing" would seem

to militate against any mitigation where such written waiver is not provided. Ill. Ann. Stat., ch. 110A, par. 63(D) (Smith-Hurd Supp. 1992).

While the scope of Rule 63(C)(1)(c) is perhaps stricter than necessary, particularly in the case of mega law firms with several hundred partners and clients numbering in the hundreds if not thousands, it is not wholly inappropriate with respect to smaller firms where every partner is aware of the various clients which the firm represents and the resultant benefits which he or she may derive from it. In any event, it is not for us to redraft the rule by judicial fiat but to enforce its provisions as we find them.

The fact that the disclosure in this case, that the full seven years had not yet expired, did not occur until the case was adjudicated should not be determinative. Notwithstanding that the court in *Woods v. Durkin* (1989), 183 Ill. App. 3d 870, 539 N.E.2d 920, appeared to take note of that factor in distinguishing the result of the Federal decision in *United States ex rel. Weinberger v. Equifax, Inc.* (5th Cir. 1977), 557 F.2d 456, I cannot agree that a purposeful distinction can be predicated upon the timing of the disclosure. This would leave the control of the impact of the rule in the hands of the judge whose participation the rule intends to restrict and regulate.

In *Woods*, even though the attorneys were apprised upfront of the grounds for the judge's disqualification they were permitted to await his ruling on the merits before asserting their rights under 63(C)(1)(c) to disqualify the judge and obtain a new trial. *A fortiori*, a party should have the right to disqualify the judge retroactively where the grounds for disqualification are not disclosed to him until after judgment.

While in this case it is clear that the trial judge acted in good faith and with complete candor and with full and prompt disclosure as soon as the facts became known to him, reversal is nevertheless mandatory under these circumstances where written waiver was not provided. See generally *Woods v. Durkin*, 183 Ill. App. 3d 870, 539 N.E.2d 920.