**CIMARRON FEDERAL SAVINGS AND LOAN ASSOCIATION, Appellant,**

v.

**Gary McKNIGHT and Denny Davidson, Andrea Lou McKnight, Peggy Davidson, McKnight Realty Company, Sav-Mor Builders Company, Willard Thomas and Cinda L. Thomas, Appellees.**

**No. 76086.**

Court of Appeals of Oklahoma, Division No. 3.

Feb. 18, 1992.

Rehearing Denied April 14, 1992.

Certiorari Denied Nov. 3, 1992.

T.P. Howell and Fred A. Leibrock, Oklahoma City, for appellant.

Warren Gotcher, McAlester, for appellees.

## OPINION

HUNTER, Judge:

Appellant, Cimarron, appeals from an adverse judgment following trial. The trial court held that Appellee–Borrowers, Gary McKnight and Denny Davidson, were not personally liable for the unpaid balance of a Note Cimarron owed. The unpaid balance of the Note at the time of trial was $287,013.11. Borrowers, McKnight and Davidson, are the only Appellees involved in this appeal. The other Appellees have no personal liability on the Note. Andrea Lou McKnight and Peggy Davidson are parties only because they signed the mortgage that secured the Note. McKnight Realty Company and Sav–Mor Builders Company owned the mortgaged property. Borrowers concede Cimarron's right to foreclose on its mortgage. The issues entirely turn on whether Borrowers, McKnight and Davidson, are personally liable under the Note.

During the pendency of this appeal, the Resolution Trust Corporation was appointed Conservator of Cimarron. As a result of Cimarron's failure, the Supreme Court ordered RTC substituted as Appellant in place of Cimarron.

Borrowers signed the Note on March 29, 1985. Under its terms, Borrowers agreed to pay Phoenix Federal Savings and Loan Association, Muskogee, Oklahoma, $241,-344.40 in monthly installments for three years, until April 1, 1987. On April 1, 1987, Borrowers were to pay the unpaid balance of the Note as a balloon payment.

In July, 1986, McKnight, and his wife sold the mortgaged property to Willard Thomas, and his wife Cinda L. Thomas. Phoenix consented to the sale of the mortgaged property. The McKnights and the Thomases entered into a Loan Assumption

and Modification Agreement with Phoenix.[1] Under the Modification Agreement, Thomas and his wife "assume[d] and agree[d] to pay" the Note. Phoenix also reduced the interest rate from an adjustable rate, calling for a minimum of 12%, to a fixed rate of 11%. The Agreement called for monthly payments of $2,491.13 each from August 1, 1986 through July 1, 1991.

On March 29, 1988, Phoenix entered into a second Modification Agreement with Thomas. The only additional change it made in the Note was to further reduce the interest rate from 11% to 10%.

Both Modification Agreements contained the following provision:

> It is expressly understood and agreed that in every other respect each and every provision of said note above mentioned shall be and remain in full force and effect ...

The Thomases' Loan Application, dated July 10, 1986, contained the notation, "Original borrower not relieved of liability."

Phoenix carried the Note and the first Modification Agreement under loan account number 03–0005786. Phoenix assigned loan account number 01–10124294 to the second Modification Agreement. On the day Phoenix and Thomas signed the second Modification Agreement, March 29, 1988, Phoenix changed the loan account number of the Note and first Modification Agreement from 03–0005786 to 01–10124294, the account number assigned to the second Modification Agreement.

On August 31, 1988, the Federal Home Loan Bank Board appointed the Federal Savings and Loan Insurance Corporation as Receiver for Phoenix. On the same day, Cimarron took an assignment of the Note and the mortgage securing it from Phoenix's Receiver, the FSLIC.

The central issue in this appeal is whether the Note was an asset of Phoenix when the FSLIC took over Phoenix's assets. This is crucial because a rule of federal law called the *D'Oench* doctrine governs this

case. We have found no Oklahoma Cases dealing with this rule of law. It is therefore important that we analyze the *D'Oench* doctrine.

### The D'Oench Doctrine

■ The *D'Oench* doctrine is a rule of federal common law. It applies to suits brought by federal authorities, or their assignees, against debtors of federally regulated banking or savings and loan institutions after the institutions fail and federal authorities take them over. It limits the defenses of debtors of these failed institutions to those supported by the institution's official records. Oral agreements between officers of a failed financial institution and its debtors, not reflected in the institution's records, are not available to the debtors in suits brought against them by federal authorities or their assignees.

In *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), the FDIC sued on a note held by a failed bank. The maker denied liability based on his oral agreement with the failed bank's President that the bank would never demand payment of the note. The maker had signed the note as a favor to the bank's President. The maker did so to help the bank hide that it was carrying defaulted bonds on its books. The debtor received no money from the transaction. The Supreme Court held that federal banking laws include a public policy to protect the FDIC and the public funds it administers from misrepresentations as to the assets and financial condition of the banks it insures and to whom it loans money. Id. 315 U.S. at 457, 62 S.Ct. at 679. The court held that banking authorities would be misled about the bank's financial condition if the maker could rely on his agreement with the bank's President. Thus, said the court, the maker was estopped to claim that his liability was other than as shown in the bank's official records. Id. 315 U.S. at 459–61, 62 S.Ct. at 680–81.

---

**1.** Davidson was not a party to the Modification Agreement, but he has not asserted this fact as a defense to Cimarron's action.

The failure of Penn Square Bank in July, 1982 marked the beginning of a banking and savings and loan crisis of a size not seen in the United States since the 1930s. In the ensuing ten years, a veritable blizzard of published opinions from both state and federal courts have applied the *D'Oench* doctrine. In the late 1980s, Congress enacted a comprehensive reform of the federal financial institution regulatory structure. At every stage, Congress and the courts have broadened the *D'Oench* doctrine. For example, in *FSLIC v. Murray*, 853 F.2d 1251, 1254–55 (5th Cir.1988), the court held that the *D'Oench* doctrine applied to the FSLIC to the same extent it applied to the FDIC.

Congress created the Resolution Trust Corporation as part of its broad reform of the statutes regulating financial institutions. Congress gave the RTC the same powers as the FDIC and the FSLIC had prior to the passage of the new act. 12 U.S.C. § 1441a(b).

Assignees of the FSLIC and the FDIC are protected by the *D'Oench* doctrine. *Porras v. Petroplex Savings Association*, 903 F.2d 379 (5th Cir.1990); *Bell & Murphy & Assoc. v. Interfirst Bank Gateway*, 894 F.2d 750 (5th Cir.1990); *Willow Tree Investments, Inc. v. Wagner*, 453 N.W.2d 641 (Iowa 1991).

■ Even misrepresentations by bank officers are not a defense to a suit by regulators. *Langley v. FDIC*, 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987). In *Langley*, the court stressed the importance to bank examiners of the reliability and accuracy of bank records in evaluating the worth of the bank's assets:

> Such evaluations are necessary when a bank is examined for fiscal soundness … and when the FDIC is deciding whether to liquidate a failed bank … or to provide financing for purchase of its assets (and assumption of its liabilities) by another bank … The last kind of evaluation, in particular, must be made "with great speed, usually overnight, in order to preserve the going concern value of the failed bank and avoid an interruption in banking services." [Citation omitted.]

To be enforceable, any agreement must not merely to be in the bank's records, but also, "have been approved by officially recorded action of the bank's board or loan committee." Id. 484 U.S. at 92, 108 S.Ct. at 401.

In 1950, Congress passed 12 U.S.C. § 1823(e), which statutorily mandated the same general rule first set forth in *D'Oench, Duhme*, Id. In *Langley*, the court held that both *D'Oench, Duhme* and § 1823(e) protected the FDIC from any agreement not fully documented in a bank's official records.

■ A borrower may not rely on *any* oral representation or agreement to vary or defeat the express terms of a note, which on its face is valid and enforceable. *FDIC v. Van Laanen*, 769 F.2d 666 (10th Cir. 1985).

### I.

We turn now to the specific issues of this case. Borrowers argued, and the trial court held, that the *D'Oench* doctrine did not apply because the Note was terminated on March 29, 1988. Borrowers' theory is that they were liable only on loan account number 03–70005786. From this they argue that Phoenix extinguished Borrowers' indebtedness when it closed out account number 03–70005786 and transferred its unpaid balance of $234,840.00 to account number 01–10124294. The final step in borrowers' argument is that, after Phoenix closed account number 03–70005786, Phoenix no longer held the Note as an asset, so the Note did not pass to the FSLIC. We disagree.

■ Borrowers' argument fails because, when Phoenix failed, the Note and both Assumption and Modification Agreements were on its books as assets. Phoenix's internal account numbers were not the evidence of Borrowers' indebtedness. McKnight and Davidson became liable under the express terms of the Note. Neither Modification Agreement relieved Borrowers of the liability they undertook when

they signed the Note. There was but a single debt. McKnight, Davidson, and Thomas were liable under its terms. No Phoenix record shows otherwise. McKnight is a practicing lawyer. He should have recognized that he would remain liable on the Note until and unless Phoenix released him in writing.[2] McKnight and Davidson admit that they paid nothing on the Note after the date of the first Modification Agreement. The D'Oench doctrine estops Borrowers to deny their liability as shown by Phoenix's records.

Borrowers claim the trial court properly allowed parol evidence in support of Borrowers' claim that Phoenix agreed to release them from personal liability. Borrowers rely, primarily, on *FDIC v. Nemecek*, 641 F.Supp. 740 (D.Kan.1986). In *Nemecek*, debtor claimed a bank orally released him in exchange for a quit claim deed, although the bank was still carrying the note as an asset when it failed. We do not believe that *Nemecek* correctly applied the *D'Oench* doctrine. We agree with another Kansas federal judge's analyses of *Nemecek*. In *FDIC v. Cover*, 714 F.Supp. 455, 458 (D.Kan.1988), the court said:

> [The *Nemecek*] rationale requires the court to, in a preliminary step, look to evidence not permitted by § 1823(e) to determine the FDIC's rights with respect to each item reflected in a failed bank's books as an asset and purchased by the corporation. *Such a theory would destroy the effect and protection of § 1823(e)* and hamper the FDIC's ability to follow the purchase and assumption alternative by injecting uncertainty into the valuation of assets. [Emphasis added.]

■ In *FDIC v. Krause*, 904 F.2d 463, 466 (8th Cir.1990), the court rejected the debtor's assertion that, as the result of an oral accord and satisfaction, debtor's note was not among the assets of a failed bank. The court said:

At the time the FDIC took over the bank, the original promissory notes were in the bank's files, the notes bore no notation that they had been paid and the minutes of neither the board of directors nor the loan committee indicated any settlement agreement.

In *Madonna Corp. v. FDIC*, 563 So.2d 763 (Fla.App.2d Dist.1990), the court held that federal law applies at the instant a bank is declared insolvent and passes into the hands of the federal receivers. From and after that moment, federal law preempts any incompatible state law right to rely on oral agreements or representations. We agree with and adopt this analysis.

The trial court erred in allowing Borrowers to introduce parol evidence of an agreement contrary to the Note and Modification Agreements, which were a part of Phoenix's records when the FSLIC became Phoenix's receiver.

## II.

Borrowers and Cimarron raise state law issues concerning the admissibility of parol evidence to vary the terms of the Note. We will not address their arguments on the state law issues because this case is governed by *federal*, not state, law.

REVERSED and REMANDED with instructions to set aside the judgment in favor of Borrowers and enter judgment against Borrowers and in favor of RTC, as Cimarron's Conservator.

JONES, J., concurs.

HANSEN, V.C.J., concurs in result.

---

2. The record shows that on July 3, 1987, McKnight entered into a written agreement with Phoenix concerning another loan. Under its terms, Phoenix took a deed in lieu of foreclosure of a real estate mortgage and expressly released McKnight from personal liability. Phoenix's records contained no similar document with respect to the Note.