The **PRUDENTIAL INSURANCE COMPANY OF AMERICA,** a New Jersey corporation, Plaintiff–Appellee,

v.

**ALLIED TOWER, LTD.,** an Oklahoma limited partnership; Henderson National Corporation, an Oklahoma corporation; C.A. Henderson, an individual; Travis Henderson, an individual; Henderson Properties, Inc., an Oklahoma corporation; and Henderson Holding Company, Inc., an Oklahoma corporation, Defendants,

and

Federal, Deposit Insurance Corporation, in its capacity as Receiver for Allied Oklahoma Bank, N.A., a national banking association, Defendant–Appellant.

No. 77834.

Supreme Court of Oklahoma.

Oct. 26, 1993.

As Corrected on Denial of Rehearing May 10, 1994.

Dissenting Opinion May 10, 1994.

Stephen P. Friot, Spradling, Alpern, Friot, Gum & Scoggins, Oklahoma City, for plaintiff-appellee.

T.P. Howell, Jane S. Eulberg, Oklahoma City, and Ann S. DuRoss, Asst. Gen. Counsel, Colleen B. Bombardier, Sr. Counsel, Gregory E. Gore, Counsel, Federal Deposit Insurance Corporation Washington, DC, for defendant-appellant.

WATT, Justice.

The trial court granted summary judgment to Appellee, Prudential, as successor in interest to Allied Tower, Ltd., against the Federal Deposit Insurance Corporation as receiver for Allied Bank for underpayment of rent due under a lease. Prudential had lent Allied Tower over seven million-dollars in 1984. Prudential's loan was secured both by a mortgage on the office building owned by Allied Tower, and by leases from the building's tenants. As a condition of making the loan Prudential required that Allied Tower secure estoppel letters from its major tenants, including Allied Bank. Under the terms of its estoppel letter Allied Bank agreed not to modify the lease or to waive any performance required by its terms without Prudential's written consent.[1] The parties do not dispute that Allied Bank's president signed the Prudential estoppel letter in the ordinary course of business, nor is there any contention that Allied Bank's president concealed his actions from the bank's board of directors or from his fellow bank officers.

Allied Tower and Allied Bank were closely related. One of Allied Tower's limited partners, C.A. Henderson was a major shareholder in Allied Oklahoma Bancorp, Allied Bank's

---

1. Allied Bank's estoppel letter to Prudential provided:

10. That the undersigned agrees that without your written consent, the undersigned will not: (a) modify or in any manner alter the terms of the subject Lease; (b) pay the rent or any other sums becoming due under the terms of the subject Lease more than two months in advance; or (c) accept Landlord's waiver of or release from the performance of any obligation of Tenant under the subject Lease; ...

holding company. Allied Tower's general partners were Travis Henderson, who is C.A. Henderson's son, and Henderson Properties, Inc., a corporation owned and controlled by the Hendersons.

Allied Bank had leased a large amount of space in Allied Tower's office building, for $42,227.50 per month. Allied Tower defaulted on its loan from Prudential by failing to make any payments due under its terms after the November 1987 payment.[2] On May 10, 1988, Prudential notified Allied Tower that the entire unpaid balance of the loan was immediately payable because of Allied Tower's default. Three weeks later, unknown to Prudential and in admitted violation of Allied Bank's estoppel letter, Allied Tower and Allied Bank purportedly modified the terms of their lease. These changes, which Prudential calls the "Midnight Amendments," ostensibly reduced Allied Bank's monthly payments from $42,227.50 per month to $9,853.08 per month. The amendments also forgave all unpaid lease payments owed by Allied Bank, and gave Allied Bank the right to terminate its lease if the building ceased to be owned by Allied Tower's general partners, Travis Henderson and Henderson Properties, Inc.

Prudential sued to foreclose its mortgage on June 9, 1988. Prudential sought and, on July 29, 1988, obtained an order appointing a receiver of the Allied Tower office building. Prudential did not learn of the purported amendments until the receiver told it about them after Allied Bank refused to pay the receiver any amounts beyond the reduced sums called for by the amendments. On November 21, 1988, Prudential filed an amended petition in which it joined Allied Bank as an additional party. Prudential alleged that Allied Bank had violated the terms of its estoppel letter, and attached a copy of its estoppel letter to its amended petition.

Prudential obtained judgment on its loan on January 6, 1989. The judgment authorized Prudential to satisfy its judgment from the building leases. Subsequently, Pruden-

tial bought the building at a sheriff's sale. After crediting the amount Prudential paid for the building at sheriff's sale, a deficiency of more than four million dollars remained unpaid on the judgment.

On April 13, 1989 the FDIC was appointed receiver of Allied Bank and was substituted for Allied Bank as a party defendant. On August 16, 1990, the trial court granted Prudential summary judgment against the FDIC for all amounts due but unpaid from Allied Bank under the terms of the original lease. The trial court held that because the amendments to the lease violated Allied Bank's estoppel letter to Prudential, they were void. The trial court also granted Prudential prejudgment and post-judgment interest on the judgment. The Court of Appeals affirmed the summary judgment for Prudential. The Court of Appeals, however, limited the interest Prudential could recover to the period between Allied Bank's default and the date the FDIC was appointed receiver, on the ground that the FDIC could not be liable for post insolvency interest. Both Prudential and the FDIC sought certiorari, and we granted both petitions for certiorari on June 21, 1993.

The FDIC filed in the case an affidavit of one of its employees, which said that when the FDIC was appointed receiver it found no copy of the estoppel letter from Allied Bank to Prudential in the bank's records, although copies of the original lease and the amendments were there. Nevertheless, the existence of the estoppel letter was a matter of public record. On November 21, 1988, Prudential filed an amended petition with the Court Clerk of Oklahoma County joining Allied Bank as a party defendant. Prudential attached a copy of the estoppel letter to its amended petition. In its amended petition Prudential sought to recover from Allied Bank the difference between the amounts due under the lease payments called for by the original lease and those paid by Allied Bank under the purported amendments to

---

**2.** Prudential agreed to a modification of the terms of its loan to Allied Tower in October 1987 by deferring payment of some of the interest owed by Allied Tower. The estoppel letter that

Allied Bank had given to Prudential as part of the original loan transaction remained in effect, however.

the lease. Prudential relied on its estoppel letter from Allied Bank to support its claim.

On certiorari each party raises a single issue. The FDIC claims that, as a matter of federal law, it may ignore the estoppel letter because its employees did not find a copy of the estoppel letter in the bank's records when the FDIC took over. Prudential claims that it was entitled to interest even after the FDIC was appointed as Allied Bank's receiver.

## DISCUSSION

### I.

### *The FDIC Was Bound by the Estoppel Letter*

■ The FDIC claims that Prudential should be prohibited from relying on its estoppel letter from Allied Bank under *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942) and its progeny. *D'Oench*, was a suit by the FDIC against a customer of a failed bank. The customer resisted paying a note he had given to the bank because he had received no money and the bank's president had orally agreed that the bank would never demand payment on the note. The Supreme Court rejected the contention on the ground that to allow the customer to avoid liability on the note on the strength of an oral side agreement not reflected by the bank's records would mislead regulators about the financial condition of the institutions they regulated.

In 1950 congress passed 12 U.S.C. § 1823(e) which codified the *D'Oench* doctrine.[3] For the reasons we discuss in this opinion, we hold that neither *D'Oench* nor § 1823(e) apply to the facts of this case.

The FDIC asserts that *D'Oench* and § 1823(e) apply even when no asset is at issue. This is a misleading assertion. In every case we have found in which *D'Oench* or § 1823(e) have been applied, a court refused to enforce a *subsequent* agreement between a bank and one of its *customers*, which may or may not have involved an asset of the bank. Enforcement of the second agreement was prohibited because enforcement would have deprived the FDIC of a valuable right established in an *earlier* agreement. The FDIC's rights, in every case, were based on an earlier agreement between the bank and its customer, which was reflected in the failed bank's records. Usually the subsequent agreement was used in an attempt to defeat the FDIC's claim to payment of an earlier note or guaranty.[4] By contrast, Prudential was not Allied Bank's customer and the estoppel letter was the only agreement between Prudential and Allied Bank. When Allied Bank failed, Allied Bank's records reflected no obligations or rights relating to Prudential.

*Howell v. Continental Credit Corp.*, 655 F.2d 743, 746 (7th Cir.1981), is similar to the case at bar because there was only one agreement between the parties, a lease. The

---

**3.** In material part, § 1823(e) provides:

No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it under this section ... either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement [is in writing, was signed by the failed bank at the time the bank's asset was created, was approved by the bank's board of directors, and was continuously thereafter a part of the failed bank's official records.]

**4.** For example, see the following cases, relied on by the FDIC, in all of which the FDIC's opponent sought to avoid their preexisting obligations that were unqualified, unconditional, unilateral, promises to pay money evidenced by notes, guaranties, or both:

*Langley v. FDIC*, 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987) (note); *FSLIC v. Griffin*, 935 F.2d 691, 967 (5th Cir.1991) (FDIC may rely on bank records "to set forth the rights and obligations of the bank and those *to whom it lends money* "); *Mainland Sav. Ass'n. v. Riverfront Assoc., Ltd.*, 872 F.2d 955 (10th Cir.) cert. den. 493 U.S. 890, 110 S.Ct. 235, 107 L.Ed.2d 186 (1989) (note); *Bell & Murphy & Assoc., Inc. v. Interfirst Bank Gateway*, 894 F.2d 750 (5th Cir.), cert. den., 498 U.S. 895, 111 S.Ct. 244, 112 L.Ed.2d 203 (1990) ($30,000,000 loan guaranty); *Twin Constr., Inc. v. Boca Raton, Inc.*, 925 F.2d 378 (11th Cir.1991) (notes and guaranties); *FDIC v. Hamilton*, 939 F.2d 1225 (5th Cir.1991) (note); *FDIC v. O'Neil*, 809 F.2d 350 (7th Cir.1987) (notes); *FDIC v. O'Malley*, 249 Ill.App.3d 340, 188 Ill.Dec. 248, 618 N.E.2d 818 (1993) (guaranty); *RTC v. Sharif–Munir–Davidson Dev. Corp.*, ·992 F.2d 1398 (5th Cir.1993) (notes and guaranty).

court refused to apply *D'Oench* or § 1823(e) because Howell, the party contesting the FDIC, was not trying to avoid a preexisting obligation by relying on a subsequent agreement. As the Seventh Circuit later said in *FDIC v. O'Neil*, 809 F.2d 350, 354 (7th Cir. 1987), "there was no side agreement in *Howell*."

The FDIC relies on *North Arkansas Medical Ctr. v. Barrett*, 962 F.2d 780 (8th Cir. 1992). The case is inapplicable here, however. In *Barrett*, a customer of a failed thrift institution had one million dollars on deposit when the institution failed. The customer claimed that because of a security interest the customer held in certain securities, which the bank had wrongfully sold, the customer should not be limited to a partial payment for the uninsured portion of its deposit. The customer insisted that it should be paid one hundred percent of the uninsured portion of its deposit. A copy of the customer's security agreement, a letter, was not in the bank's records when the FDIC took over. The court properly held that § 1823(e) applied because the customer was claiming rights against the FDIC based on a *second* undocumented agreement, which if enforced would have deprived the FDIC of rights against the customer shown to exist by the bank's deposit records. The court held that the FDIC was entitled to rely on the first agreement between the parties, the failed bank's deposit records.

The closest case we have found to the factual situation present here is *FDIC v. RepublicBank, Lubbock*, 883 F.2d 427 (5th Cir.1989). In *RepublicBank* the FDIC invoked *D'Oench* in an attempt to defeat the priority of a mortgage lien, owned by RepublicBank, concerning which the FDIC's predecessor, Texas Bank, had signed a subordination agreement. Texas Bank's and Republic-Bank's liens were presented for filing together. By happenstance, when the liens were filed in the land records, Texas Bank's lien was filed first, one minute earlier than Re-publicBank's lien. The FDIC claimed that its lien had priority over RepublicBank's lien because of the earlier filing, and that Republic-Bank could not rely on the subordination agreement, because neither Texas Bank's

board nor loan committee had approved it. The court rejected the FDIC's contention because the subordination agreement was the only agreement between Texas Bank and RepublicBank. In the subordination agreement, which had also been filed in the land records, Texas Bank expressly agreed that its lien would be junior to RepublicBank's. In other words, there was no subsequent, undocumented, agreement reflected in the failed bank's records, which if enforced would have deprived the FDIC of rights against one of its customers.

We have found no case holding that either *D'Oench* or § 1823(e) applies to agreements, such as the estoppel letter in the case at bar, in which no claim is made that an undocumented agreement modifies or extinguishes an *earlier* agreement between the bank and one of its customers reflected in the bank's records. *D'Oench* and § 1823(e) apply only in situations where a bank customer attempts through proof of an undocumented second agreement to improve its economic position established in an earlier agreement with the failed bank. No such situation exists here. The only agreement between the parties was the estoppel letter. Consequently, neither *D'Oench* nor § 1823(e) prohibit Prudential from enforcing its rights.

The FDIC relies on the Court of Appeals' opinion in *Cimarron Federal Sav. and Loan Ass'n. v. McKnight*, 840 P.2d 648 (Okla.App. 1992). The FDIC's reliance on *Cimarron*, however, is misplaced. There the Court of Appeals correctly applied *D'Oench* against *customers* of a failed thrift institution who sought to prove a *later* agreement to avoid liability under an *earlier* note. Thus, *Cimarron* is identical to every other case we have found in which *D'Oench* or § 1823(e) has been applied, and is entirely unlike the case at bar.

The absence from the bank's records of Allied Bank's estoppel letter to Prudential is not surprising in light of Allied Bank's "midnight amendments" to the lease, which were made without Prudential's knowledge or consent. Because a copy of the estoppel letter was not in Allied Bank's records the FDIC would have us pervert a sound rule of federal law by applying it in a situation unlike any to

which the federal courts have applied it. We decline to do so.

To accept the FDIC's contention that *D'Oench* and § 1823(e) apply here would promote fraud, not prevent it. To allow such a result would give "the FDIC the ability to transmute lead into gold." *FDIC v. Aetna Casualty & Surety Co.*, 947 F.2d 196, 207 (6th Cir.1991), quoting *Sunbelt Savings, FSB Dallas v. Montross*, 923 F.2d 353, 357 (5th Cir.1991), rehearing *en banc* granted 932 F.2d 363. The estoppel letter between Prudential and Allied Bank is valid and enforceable against the FDIC.

## II.

### *The FDIC is Liable to Prudential for Post Insolvency Interest*

■ The trial court awarded interest against the FDIC on Prudential's judgment. The Court of Appeals affirmed the interest awarded for nonpayment of Prudential's claim before the time the FDIC declared Allied Bank insolvent, but reversed the trial court's award of interest that accrued after Allied Bank's insolvency. Prudential contends that it is entitled to post insolvency interest. We agree.

The FDIC sold Allied Bank's assets to an assuming bank, which assumed some, but not all, of Allied Bank's liabilities and continued Allied Bank's business following insolvency. The assuming institution did not assume liability for Prudential's claim against Allied Bank, and the FDIC refused to pay it. Prudential proceeded with its suit and ultimately obtained the judgment from which the FDIC brought this appeal.

■ The practice of selling a failed bank's assets to a successor so that the failed bank's business will continue is known as a purchase and assumption transaction. The purchase and assumption transaction is the most common method by which the FDIC handles the assets and liabilities of failed banking institutions. Purchase and assumption transactions have the advantage of continuing the failed bank's business without interruption. Thus, the FDIC need not pay insurance funds to depositors of the failed bank, and the drastic economic effects that closure of the bank might have on those who were doing business with it are avoided. Purchase and assumption transactions are authorized by the Federal Deposit Insurance Act, 12 U.S.C. § 1821(f).

Prudential relies on *First Empire Bank. v. FDIC*, 572 F.2d 1361 (9th Cir.1978), *cert. denied* 439 U.S. 919, 99 S.Ct. 293, 58 L.Ed.2d 265 (1978) in support of its contention that it is entitled to interest on its judgment after the insolvency of Allied Bank. In *First Empire*, the Ninth Circuit held that the FDIC was required to pay post insolvency interest on a claim because the FDIC had refused to pay the claim, although it was due and payable on the date of the bank's insolvency.

The FDIC claims it should not have to pay post insolvency interest because doing so would violate the rule that the assets of a failed bank be distributed ratably. We disagree. The FDIC relies on *White v. Knox*, 111 U.S. 784, 4 S.Ct. 686, 28 L.Ed. 603 (1884). In *First Empire*, the FDIC made the identical contention. In rejecting the FDIC's contention, the Ninth Circuit said:

> However, a difference must be recognized between the case where interest accruing after insolvency is added to become a part of the claim itself and the case where interest is awarded in addition to the amount of the claim for failure of the receiver to pay the claim when it became due . . .

*First Empire*, 572 F.2d at 1372.

The court noted that this distinction had been recognized and approved by the Supreme Court in *Armstrong v. American Exchange Nat'l Bank*, 133 U.S. 433, 470, 10 S.Ct. 450, 461, 33 L.Ed. 747 (1890) and *Ticonic Nat'l Bank v. Sprague*, 303 U.S. 406, 58 S.Ct. 612, 82 L.Ed. 926 (1938). Here, as in *First Empire*, post insolvency interest was awarded only because the FDIC had refused to pay a creditor's valid claim when submitted. The record shows that the FDIC paid other creditors' claims in full at or near the time they were submitted. Had the FDIC handled Prudential's claim when due as it handled the other creditor's claims, no additional interest would have accrued.

Relying on our opinion in *Anderson v. Dyco Petroleum Corp.,* 782 P.2d 1367, (Okla. 1989), the FDIC claims that Prudential has waived any error relating to the award of interest because Prudential referred to its right to interest on its "claim" in its briefs, rather than referring to its right to interest on a "dividend." This is a distinction without a difference. Prudential made clear the basis of its claimed right to interest and briefed the issue thoroughly. In *Anderson,* we held that assignments of error unsupported by arguments or authority are deemed waived. That Prudential called the obligation upon which it claimed an interest a "claim" rather than a right to a "dividend" did not constitute a failure to brief an assignment of error.

The FDIC seeks to distinguish *First Empire* and *Armstrong.* According to the FDIC, *Armstrong* does not apply because the dispute in *Armstrong* involved a creditor's right to a dividend, while here, there was no dividend paid. Although the FDIC paid no dividends here, this fact does not help the FDIC. The teaching of *Armstrong* is that the FDIC must pay interest on a claim from the date the claim should have been paid. The Ninth Circuit in *First Empire* applied the *Armstrong* rule in circumstances virtually identical to the case at bar. In *First Empire* the failed bank's successor assumed most of the failed bank's obligations, but not the obligation owed to the plaintiff. The court held that the plaintiff was entitled to interest on its claim for the period the FDIC had delayed paying it. We agree with this decision.

Allied Bank's successor assumed most of Allied Bank's debts on the strength of a nine million-dollar cash payment made to it by the FDIC. Thus, those of Allied Bank's creditors whose claims were assumed by Allied Bank's successor were assured of being paid as agreed. Prudential's claim was valid and payable on the date of insolvency. Consequently, the FDIC's refusal either to pay Prudential, or assign its claim following the insolvency of Allied Bank, deprived Prudential of the use of its money for which Prudential is entitled to receive interest.

Finally, the FDIC questions the validity of *First Empire* because the Fifth Circuit distinguished it in *Texas American Bankshares, Inc. v. Clarke,* 954 F.2d 329 (5th Cir.1992). In *Texas American* the Fifth Circuit rejected the portion of the *First Empire* opinion holding that a creditor related to the failed bank was entitled to be compensated on the same terms as creditors who were not related to the bank. The portion of *First Empire* we find persuasive, however, dealt with a different issue. In *First Empire,* the Ninth Circuit held that post insolvency interest is recoverable when payment has been delayed by the FDIC. Whether a creditor is entitled to post insolvency interest where the FDIC has wrongfully delayed paying a claim was not an issue in *Texas American.* In *Texas American,* the Fifth Circuit did not discuss the portion of *First Empire* that held the FDIC liable for post insolvency interest. Thus, there is nothing in *Texas American* that calls into question in any way the portion of *First Empire* that is relevant to this appeal.

The trial court correctly awarded post insolvency interest to Prudential.

CERTIORARI PREVIOUSLY GRANTED, COURT OF APPEALS' OPINION VACATED, TRIAL COURT'S JUDGMENT AFFIRMED.

HODGES, C.J., and HARGRAVE, OPALA, ALMA WILSON and KAUGER, JJ., concur.

LAVENDER, Vice C.J., and SIMMS, J., dissent.

SUMMERS, J., disqualified.

LAVENDER, Vice Chief Justice, dissenting:

The majority opinion masquerades as an interpretation of federal law. In point of fact, its holding is based on equitable considerations unsubstantiated by either federal case law or statutory law. A careful review reveals that this case is controlled by an established doctrine of law first pronounced in *D'Oench, Duhme & Co. v. FDIC*,[1] and subsequently codified at 12 U.S.C.

1. 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942).

§ 1821(d)(9) and § 1823(e). For this reason, I withdraw my support of the majority's opinion.

The *D'Oench* doctrine is a federal policy designed to protect FDIC *and the public funds which it administers,* against misrepresentations as to the securities or other assets in the portfolios of the banks which FDIC insures or to which it makes loans.[2] It is essential that the FDIC have *notice of any claim* that might defeat an asset of an insolvent bank at the time the FDIC decides whether a bank is to be closed or resold. "Neither the FDIC nor state banking authorities would be able to make reliable evaluations if bank records contained seemingly unqualified notes that are in fact subject to undisclosed conditions."[3]

Thus, *D'Oench* and its progeny as well as its statutory counterpart require, that if there is a claim against FDIC which would defeat an asset of FDIC and the claim is not documented in the Bank's records it is *ineffective* as a defense against FDIC. The FDIC need look no further than the official bank records, and this is true whether the case involves: a traditional loan transaction, an affirmative claim, a disputed document that was a matter of public record, where it might be equitable to do so or, where suit has commenced prior to FDIC taking over the bank to name but a few situations.[4]

However, Prudential has successfully argued from the inception of this suit that the Estoppel Letter is the *only* agreement Prudential is trying to enforce and that it is not a side agreement subsequent to an earlier document hence, it falls outside *D'Oench* and progeny. This is simply not true. The *only* documents found in the Bank's record by the FDIC at the time of receivership were the original and amended leases.

Prudential, in its response to FDIC's petition for rehearing to this Court, finally acknowledges that it is *not* relying on the Estoppel Letter as a *predicate* for its claim, rather Prudential is counting on the Estoppel Letter to *thwart* FDIC's effort to rely on the amended lease.[5] In point of fact, it *is* the terms of the Estoppel Letter that Prudential is trying to enforce and the letter *is an unrecorded side agreement which states terms other than those expressly stated on the face of the original and amended leases and if allowed to stand, will defeat an asset of FDIC.*

This is why Prudential *cannot* hold FDIC liable under the terms of the original lease based on the Estoppel Letter. Clearly, Prudential had every right to sue Allied Tower, Ltd. and Allied Bank over the amended lease (Midnight Amendments). However, the moment FDIC became receiver of the Bank,

---

2. *FDIC v. Aetna Casualty & Surety Co.,* 947 F.2d 196, 200 (6th Cir.1991).

3. *North Arkansas Medical Center v. Barrett,* 962 F.2d 780, 788–89 (8th Cir.1992). As stated in *FDIC v. O'Neil,* 809 F.2d 350, 353–54 (7th Cir. 1987):

   If we accepted Joyce's argument, this would imply that when the appraiser came across the promissory note he would have had to conduct an inquiry into the whereabouts, status, and terms of the "certain agreement," mentioned in (but not a part of) the note. Yet even if he located the agreement it might not occur to him to inquire whether the banks had actually supported Joyce's bid, because the agreement does not in terms require such support. Maybe such a requirement is implicit, but this would be apparent only to one who had steeped himself in the negotiations leading up to the drafting of the agreement. The FDIC is not required to go so far. It can stop considerable shorter. *It can ignore any side agreement*

imposing conditions on the promissory notes that it acquires from troubled banks unless the agreement conforms to the demanding requirements of section 1823(e). (emphasis added) (citations omitted).

4. The failure of Penn Square Bank in July, 1982 marked the beginning of a banking and savings and loan crisis of a size not seen in the United States since the 1930s. In the ensuing ten years, a veritable blizzard of published opinions from both state and federal courts have applied the *D'Oench* doctrine. In the late 1980s, Congress enacted a comprehensive reform of the federal financial institution regulatory structure. *At every stage, Congress and the courts have broadened the D'Oench doctrine. Cimarron Federal Savings & Loan Ass'n v. McKnight,* 840 P.2d 648, 651 (Okla.Ct.App.1992) (emphasis added).

5. Appellee's Response Brief to Petition for Rehearing at 4, *Prudential* (No. 77,834).

federal law controlled.[6] And *under federal law,* Prudential cannot win because it is asking a court to enforce an outside unrecorded agreement that would deplete the bank's assets by a greater amount than FDIC anticipated upon taking over the bank. *This is exactly what the D'Oench doctrine was intended to prevent.*

This is also why the case the majority cites as a basis for its holding, *FDIC v. Republicbank Lubbock, N.A.,*[7] is unpersuasive. In *Lubbock,* FDIC was a successor to an insolvent bank and held notes secured by a lien on a building which had been occupied by a bank and then sold. FDIC claimed its lien was superior to the lien owned by the second bank. The federal court of appeals determined that *under Texas law,* a deed of trust stamped by a county clerk one minute earlier than another deed of trust did not entitle FDIC to priority where both instruments were associated with one transaction and were delivered to the clerk and received by the clerk in his official capacity at the same time. Therefore, *under Texas law,* the deed of trust lien whose priority was stated in the deed of trust as well as in the subordination agreement had priority over another deed of trust executed in connection with a single transaction. According to *Texas law,* FDIC was not entitled to avoid the subordination agreement even though the it was not in the bank vendor's records.

We need look only as far as our own court of appeals to understand why the federal court of appeals's reasoning is circumspect. In *Cimarron Federal Savings & Loan Ass'n v. McKnight,*[8] our court of appeals explained that "at the instant a bank is declared insolvent and passes into the hands of the federal receivers[,] [f]rom and after that moment, *federal law preempts any incompatible state law....* Because I believe the federal court of appeals erred in allowing Texas law to control the facts of *Lubbock,* I likewise find *Lubbock* unpersuasive as justification for our decision in the present case.

I would further note that the equities of the situation, the fact that Prudential stands to lose a significant amount of money, is legally irrelevant at this stage of the proceedings *because there is no equitable exception under the statute.* In *Langley v. FDIC,*[9] the United States Supreme Court stated:

> Petitioners are really urging us to engraft an equitable exception upon the plain terms of the statute. Even if we had the power to do so, the equities petitioner invoke are not the equities the statute regards as predominant. While the borrower who has relied upon an erroneous or even fraudulent unrecorded representation has some claim to consideration, *so do those who are harmed by his failure to protect himself by assuring that his agreement is approved and recorded in accordance with the statute....* The short of the matter is that Congress opted for the certainty of the requirements set forth in § 1823(e). An agreement that meets them prevails even if the FDIC did not know of it; and an agreement that does not meet them fails even if the FDIC knew. *It would be rewriting the statute to hold otherwise.*

While I sympathize with Prudential's plight, I would point out that Prudential was not operating from a weak position—it held all the cards. Prudential could have avoided this entire predicament by requiring the bank to put the Estoppel Letter in the Bank's records and it could have done so with little effort.

Nor, do I understand how the majority finds that were the *D'Oench* doctrine applied to this set of facts, this Court would be *promoting* fraud rather, than preventing it. It was the *Bank* that perpetuated the fraud against Prudential, yet, the Bank is not punished by the majority's decision—FDIC is made to suffer the consequences. Today's decision does nothing to dissuade the real culprits from perpetuating fraudulent acts.

6. *Madonna Corp. v. FDIC,* 563 So.2d 763 (Fla. App. 2d Dist.1990).

7. 883 F.2d 427 (5th Cir.1989).

8. 840 P.2d 648, 652 (Okla.Ct.App.1992) (emphasis added).

9. 484 U.S. 86, 94, 108 S.Ct. 396, 402, 98 L.Ed.2d 340 (1987) (emphasis added).

And more to the point, while a fraud exception to the *D'Oench* doctrine has been recognized in at least one federal case, neither the holding of that case nor the facts are analogous to our case.[10]

I also find unjustified the court's attempt to narrowly hold *D'Oench* and progeny to a situation involving a bank customer. Although, it is true that the *D'Oench* doctrine began as a way to defeat a defense on a note, *D'Oench* has subsequently been applied in numerous factual situations.[11] Moreover, I would reiterate that the *essence* of the D'Oench doctrine is that *the documentary basis for a claim must be in the Bank's records* in order to successfully defend against the FDIC. The emphasis is *not on the relationship of the parties.*[12]

The majority's analysis of this case is in err according to both federal statutory law and federal case law. Consequently, for the reasons set forth herein, I respectfully dissent from the majority's determination that the Estoppel Letter be allowed to successfully thwart FDIC's right to 'rely on the amended lease.

**I am authorized to state that Justice SIMMS joins in the views herein expressed.**

---

10. "Fraud might be relevant if it were 'independent of any understanding or side agreement,' as in a case where borrower is induced to sign a promissory note by an oral misrepresentation that the bank is solvent, and there is no side agreement." *FDIC v. O'Neil,* 809 F.2d 350, 354–55 (7th Cir.1987) (citations omitted).

11. *North Arkansas Medical Center v. Barrett,* 962 F.2d 780, 787 (8th Cir.1992).

12. "Nothing in the statute itself suggests that section 1823(e) would not apply to a *creditor's claim.*" *Id.* at 787 (emphasis added).